E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ROBERT K. QUEALY[1]
Special Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6874
     Facsimile: (213) 894-0141
     E-mail:    Robert.Quealy@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 24-00305-MRA |
|---|---|
| Plaintiff, | MEMORANDUM IN OPPOSITION TO DEFENDANT ANTONIO HERNANDEZ'S APPLICATION FOR RECONSIDERATION OF DETENTION ORDER |
| v. | |
| ANTONIO HERNANDEZ,<br>     aka "5tonio0,"<br>     aka "Tonio,"<br>IVAN MURILLO-HERNANDEZ,<br>     aka "ivann_1973," and<br>ALEXIS GARCIA MARTINEZ,<br>     aka "KrayHam,"<br>     aka "Krayster,"<br>     aka "007Krayster,"<br><br>     DefendantS. | |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Special Assistant United States Attorney Robert K.
Quealy, hereby files its memorandum in opposition to defendant

_____

     [1] Authorized to Practice Pursuant to Local Rule 83-2.1.4.2

i

ANTONIO HERNANDEZ's application for reconsideration of order setting conditions of detention (Dkt. 37).

This opposition is based upon the attached memorandum of points and authorities, the declaration of Robert K. Quealy and exhibit, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 31, 2024                    Respectfully submitted,

                                       E. MARTIN ESTRADA
                                       United States Attorney

                                       MACK E. JENKINS
                                       Assistant United States Attorney
                                       Chief, Criminal Division

                                       _____/s/_____
                                       ROBERT K. QUEALY
                                       Special Assistant United States
                                       Attorneys

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant ANTONIO HERNANDEZ ("defendant") engaged in a scheme to steal mail from post offices to obtain hundreds of thousands of dollars in checks, which he then deposited into third party bank accounts or sold to third parties who would fraudulently cash them. In one of those thefts from a post office, video surveillance footage appears to show defendant punching a postal employee in the face while fleeing from the scene of the crime.  After defendant made his initial appearance, this Court detained defendant based on both danger to the community and risk of flight.  (Dkt. 31).  The Court based its well-reasoned decision on multiple factors, including the nature and circumstances of the charged offenses, weight of evidence, the fact of defendant's lack of stable residence, employment, or community ties, and defendant's criminal history.  Id.

Defendant now applies for reconsideration of the Court's well-reasoned detention order based on proffering additional unsecured bond sureties, home detention, participation in a youth work program, and the completion of court ordered community service.  (See Defendant's Brief in Support of Application for Reconsideration of Order of Detention ("Defendant's Brief"), Dkt. 40).  No conditions can adequately mitigate the risk of danger and non-appearance, and defendant's proposals fail to adequately address the Court's cited concerns in its detention order.[1]

---

[1] As explained further below, the government proffers additional evidence proving defendant's danger and flight risk if released on bond.

## II.  ARGUMENT

### A.  Legal Standard

Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985). Courts consider several factors in detention determinations, including: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).

### B.  Defendant Is a Serious Danger to the Community

The defendant poses both an economic and physical danger to the community.  Danger to the community may include the economic harm caused by the defendant's participation in the mail theft and bank fraud scheme.  See United States v. Reynolds, 956 F.2d 192, 192 (9th Cir. 1992) ("danger may, at least in some cases, encompass pecuniary or economic harm"); accord United States v. Possino, No. CR 13-00048-SVW-3, 2013 WL 1415108, at *8 (C.D. Cal. Apr. 8, 2013) ("economic danger is a proper consideration in pretrial bail determinations"). As alleged in the indictment, defendant is accused of engaging in a mail theft and bank fraud scheme where the defendant stole checks which he then deposited into third party bank accounts or sold to third parties to fraudulently deposit.  (See "Indictment," Dkt. 1, 3-4).  The intended loss is at least $800,000.  (Id. At 5).  The

defendant is further charged with one count of aggravated identity theft resulting in the loss of $1,800 to the victim.  (See id. at 15-17).

The weight of the evidence against defendant on this point favors detention.  The defendant has posted images and videos of stolen checks to his Instagram account, including a video of himself sorting through checks which included a check valued at $559,099.  (Id. at 12; Aff. For Search Warrant ("SW Aff.") ¶ 60)[2].

The defendant also poses a physical danger to the community.  The indictment charges defendant with one count of mail theft by means of force and violence.  (Indictment, 18).  During an attempted mail theft on March 23, 2023, an individual matching the defendant's physical description can be seen on surveillance video punching a postal employee in the face as the group attempted to flee.  (SW Aff. ¶ 37).  On April 4, 2023, a defendant matching defendant's physical description punched another postal employee in the face as the employee attempted to stop the group from stealing mail at the facility.  (Id. at ¶ 41) On the same day, defendant fled from law enforcement during a highspeed pursuit across surface streets and two highways.  (Id. at ¶¶ 48-53).  Video from the incident appears to show the defendant exit the vehicle and continue to evade law enforcement on foot.  (Id. at ¶ 55; Indictment, 10).

Defendant now seeks release on bond to home detention; however, defendant has already demonstrated he is not amenable to Pretrial Services supervision.  As noted in the Pretrial Services Report, defendant is currently on probation stemming from burglary charges

---

[2] The affidavit for search warrant is attached to the Declaration of Robert K. Quealy filed concurrently herewith.

related to the theft of mail.  It appears that the community service stated as a condition of release is part of his probation. (Defendant's Brief, 2, Exh. B).  The defendant is accused of continuing to engage in the same criminal conduct giving rise to his current probationary sentence, and defendant was on probation when he placed the community in danger during the highspeed pursuit. Accordingly, the Court should find that defendant is a risk of danger to the community.

We note that the version of the Pretrial Services Report available during Defendant's initial appearance on May 15, 2024, stated that defendant did not have access to firearms in the home.  A search warrant of the defendant's Instagram returned multiple photos and videos of firearms and ammunition.

  

### C.   Defendant Presents a Substantial Risk of Non-Appearance

Defendant presents a substantial risk of non-appearance.  While defendant has no adult convictions, he still faces a significant sentence of imprisonment if convicted at trial, which creates an

4

incentive to flee or to go into hiding in the Central District.  On the 18 U.S.C. § 1028A count alone, defendant faces a mandatory minimum <u>consecutive</u> sentence of two years in prison, even before any Guidelines sentence for his participation in the mail theft and bank fraud scheme.  The bank fraud charge carries a statutory maximum sentence of 30 years, and even assuming no criminal history, the attempted loss of $800,000 corresponds to a guidelines range of 37 to 46 months.  (U.S.S.G. §§ 2B1.1 and 5A).

Such a lengthy prison sentence, especially when coupled with the strength of the evidence against defendant, provides a significant incentive for defendant to flee.  Courts have recognized this a basis for finding defendant is a flight risk.  See <u>United States v. Townsend</u>, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); <u>United States v. Gonzalez Claudio</u>, 806 F.2d 334, 338 (2d Cir. 1986) ("It is entirely reasonable to conclude that a risk of flight is more likely in circumstances where evidence indicates that defendant . . . faces a substantial risk of being convicted of serious pending charges and receiving significant punishment.").  The severity of the potential penalties involved augments defendant's risk of non-appearance.  <u>See United States v. Brennerman</u>, 705 F. App'x 13, 15 (2d Cir. 2017) (affirming denial of bail based on risk of non-appearance where defendant facing fraud charges that exposed him to a range of just 57 to 71 months' imprisonment).  Thus, the Court should also find that defendant is a risk of non-appearance.

**III. CONCLUSION**

    For the foregoing reasons, the government respectfully requests that this Court order that defendant remain detained pending trial.

### DECLARATION OF ROBERT K. QUEALY

I, Robert K. Quealy, declare as follows:

1.    I am a Special Assistant United States Attorney in the United States Attorney's Office for the Central District of California.  I represent the government in this case.

2.    Attached hereto as Exhibit 1 is a true and correct copy of the Application for a Warrant by Telephone or Other Reliable Electronic Means filed in 2:23-mj-4013 and dated August 15, 2023.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on May 31, 2024.

*/s/ Robert k. Quealy*

ROBERT K. QUEALY

7

EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>The premises located at 243 South Avenue 50,<br>Apartment 205, Los Angeles, CA 90042, as<br>described in Attachment A-1 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:23-mj-4013

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

Postal Ins ector Gabriel Rodri uez
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: August 15, 2023
_____
*Judge's signature*

City and state: Los Angeles, CA

Honorable Pedro V. Castillo, US Magistrate Judge
*Printed name and title*

AUSA: Angela C. Makabali (x2331)

## **ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premises located at ████████████, Apartment ██, Los Angeles, California 90042, ("SUBJECT PREMISES").  The SUBJECT PREMISES is an apartment located in a four-story complex with a red tile roof split into a north side and a south side. The complex is painted beige, with no car garage attached, but likely a car port and/or detached garage and/or storage closet assigned, and the apartment is on the second floor on the south side of the complex.  The apartment's front door is brown is covered by a black metal security door.  The number ██ is displayed on the top of the door with gold numbers.

The SUBJECT PREMISES can be reached by entering through the vehicle gate leading to the resident parking, proceeding between the north and south sides of the complex, walking up the stairs between the north and south building, and turning right on the second floor.  The SUBJECT PREMISES includes all attached attics, storage areas and units assigned, boxes, safes, lockers, bags, trash bins or bags, trash area, mailboxes, detached garage assigned or assigned car port(s), and any vehicles in the assigned space(s) of the SUBJECT PREMISES.

**ATTACHMENT B**

**I. ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1708 (Mail Theft), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 2114 (Assault with Intent to Rob, Steal, Purloin Mail Matter; Receipt and Possession of Stolen Mail Matter), 18 U.S.C. § 2115 (Robbery of Post Office), and 18 U.S.C. § 371 (Conspiracy to Commit the Aforementioned Offenses) (the "Subject Offenses"), namely:

a.   Indicia of occupancy, residency or ownership of the SUBJECT PREMISES and things described in the warrant, including forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, keys, letters, mail, canceled mail envelopes, or clothing, such as:

i.   Black hoodie sweatshirt with the word "cookies" on the front.

ii.   Black hoodie sweatshirt with white letters on the front.

iii. Black Vans "old school" shoes.

iv.   Blue or black jacket with white lines on the neck and wrist area.

v.   Blue or black hoodie with white color laces around the hoodie.

i

e.   U.S. currency in excess of $1,000, including the first $1,000 if more than $1,000 is recovered, bearer instruments worth over $1,000 (including cashier's checks and traveler's checks), and precious stones worth more than $1,000;

f.   Any products, goods, or merchandise purchased with fraudulent proceeds;

g.   Any identifications, checks, access devices, monetary instruments, or other official documents that are not addressed to, or in the name of HERNANDEZ or co-conspirators;

h.   Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

i.   Any documents or records concerning any bank accounts, credit card accounts, or other financial accounts, including but not limited to, deposit slips, cancelled checks, wire transfer orders or advisements of wire transfers, records of money orders or other money transfer records;

j.   Records, documents, programs, applications, or materials concerning United States mail or mail matter;

k.   Contents of any calendar or date book stored on any of the digital devices;

l.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations, for the period starting December 1, 2022 to February 1, 2023;

m.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

iii

vi.  Black hoodie sweatshirt, with a white color "Nike" logo on the chest area.

vii. White color "Nike" slides.

viii.    Black hoodie sweatshirt with a white color circular logo on the front

ix.  Gray color hoodie sweatshirt.

x.   Dark blue hoodie sweatshirt.

xi.  Blue jeans with large rips in both knee areas.

xii. Black color ski mask.

b.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than HERNANDEZ or co-conspirators, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

c.   Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

d.   Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

show address book information, including all stored or saved telephone numbers;

n.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

o.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

p.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

q.   Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or relating to the possession or fraudulently obtained checks or funds or the collection or transfer of the proceeds of the above-described offenses; and

2.    Any device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.    With respect to any device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

        viii.    records of or information about Internet Protocol addresses used by the device.

4.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. <u>SEARCH PROCEDURE FOR THE ELECTRONIC DEVICES</u>

6.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.   During the execution of this search warrant, law enforcement is permitted to: (1) depress ANTONIO HERNANDEZ' thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of HERNANDEZ' face with his eyes open to activate the facial-, iris-, or retina-recognition feature,

in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

## **AFFIDAVIT**

I, Gabriel Rodriguez, being duly sworn, declare and state as follows:

### I.  **INTRODUCTION**

1.    I am a Postal Inspector ("PI") with the United States Postal Inspection Service ("USPIS") and have been so employed since February 2016.  I am currently assigned to the Los Angeles Division, San Bernardino Mail Theft Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, related activity in connection with access devices (including credit and debit cards), identity theft, and violent crimes against the USPS or its employees.  I graduated from the USPIS's Federal Law Enforcement Training Academy in Potomac, Maryland.  In addition, I have received both formal and informal training from the USPIS regarding mail and identity theft investigations, and violent crimes investigations.

2.    Through my training and experience, I have learned that by stealing mail or parcels, mail thieves can gain access to items such as checks, money orders, cash, and gift cards, as well as individuals' personal information, and use such information to commit identity theft, identity fraud, and access device fraud with credit cards and debit cards.

### II.  **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of a search warrant for ███████████, Apartment ██, Los Angeles, California

90042 (the "SUBJECT PREMISES"), as described more fully in
Attachment A-1, and the person of Antonio HERNANDEZ
("HERNANDEZ"), as described more fully in Attachment A-2, for
the evidence, fruits, and instrumentalities of violations of 18
U.S.C. § 1708 (Mail Theft), 18 U.S.C. § 1344 (Bank Fraud), 18
U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 2114
(Assault with Intent to Rob, Steal, Purloin Mail Matter; Receipt
and Possession of Stolen Mail Matter), 18 U.S.C. § 2115 (Robbery
of Post Office), and 18 U.S.C. § 371 (Conspiracy to Commit the
Aforementioned Offenses), (collectively the "Subject Offenses"),
as described more fully in Attachment B.

        4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only, and all dates and times
are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

        5.    The USPIS is investigating the Subject Offenses
arising from approximately 49 mail theft incidents from United
States Postal Service ("USPS") Post Office locations throughout
the Central District of California beginning on or around

December 1, 2022, and continuing to the present, by what appears to be the same group (or overlapping groups) of suspects.

6.    HERNANDEZ is one the suspects involved in the USPIS investigation involving the Subject Offenses.  As described below, in addition to stealing or attempting to steal mail from various post offices throughout the Central District of California at least 10 times, he has punched at least one USPS employee and possessed other people's checks without their permission.

7.    Based on HERNANDEZ' numerous previous encounters with Los Angeles Police Department ("LAPD") officers (the "Officers") in the apartment building containing the SUBJECT PREMISES within the last year, I believe that HERNANDEZ resides at the SUBJECT PREMISES, which is listed in law enforcement databases as his address of record.  Moreover, when the Officers arrested HERNANDEZ earlier in 2023, he told them that his address was the SUBJECT PREMISES.  Most recently, on July 16, 2023 and August 5, 2023, the Officers were patrolling the building containing the SUBJECT PREMISES and saw HERNANDEZ in the same apartment building as the SUBJECT PREMISES.  Based on my training and experience, I believe there is probable cause that the SUBJECT PREMISES contains evidence, fruits, and instrumentalities of the Subject Offenses.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    Background

8.    Based on my own participation as one of the lead Inspectors in this investigation, having conducted and reviewed

3

interviews with USPS employees, reviewed video surveillance, and spoken with local law enforcement investigators, as well as reviewed law enforcement reports, I know the following:

9.   A "back dock theft" incident is a mail theft that occurs when a suspect, or group of suspects, drives or walks up to the back dock (truck loading area) of a United States Post Office to steal mail directly from the USPS.  In most cases the suspect(s) approach the back dock in a vehicle then enters into an area where mail is sorted/staged for delivery or will actually enter through an employee entrance into the workroom floor, to steal a large quantity of mail in a short time.  The suspect(s) then uses a waiting vehicle to leave the area.

10.  My investigation determined that similarities in the characteristics, physical appearance, and modus operandi of the suspect(s) involved in these back dock thefts appear to be connected.  More specifically, approximately 49 back dock thefts appear to be perpetrated by the same (or overlapping) group(s) of suspects.  Some of the common characteristics of these incidents are as follows:

a.   The suspects appear to be groups ranging from two to five Hispanic individuals, ranging in age from their late teens or early twenties, with at least some suspects being identified as minors.

b.   Most suspects have been identified as Hispanic males; however, in at least a few of the incidents, the male suspects have been assisted by Hispanic females in the same age range.

4

c.    In most incidents, the suspects wore face masks.

d.    The suspects used different vehicles during the back dock theft incidents, but several vehicles appear to be used more than once in connection with other back dock theft incidents.  At least some of the vehicles had numbers and/or letters of the license plates concealed.

11.   Through this investigation, I have learned that LAPD Gang Enforcement Officers J. Castro ("Ofc. Castro") and M. Rolon ("Ofc. Rolon") (collectively, the "Officers") have gained familiarity with suspects involved in my investigation, including HERNANDEZ and his minor brother, J.H.  The Officers assisted the USPIS with identifying the suspects of the back dock theft incidents.

a.    The Officers were familiar with HERNANDEZ's physical appearance and distinctive articles of clothing because of their previous interactions with HERNANDEZ, including previous arrests, some of which are described below.

**B.    December 2022**

12.   On or about December 28, 2022, a back dock theft occurred at the Studio City Post Office, which is located at 3950 Laurel Canyon Boulevard, Studio City, California 91605.

13.   Surveillance footage from the Studio City Post Office showed a silver Toyota Corolla bearing license plate number ▮▮▮▮▮ (the "SILVER COROLLA") as the getaway car.  All four suspects appeared to be Hispanic males.  One of them was wearing a white T-shirt, black pants, and black and white Vans-style sneakers.

14.   On or about December 29, 2022, LAPD officers detained HERNANDEZ and J.H. as passengers in the SILVER COROLLA. HERNANDEZ was arrested on violations of the California Penal Code 459 (Burglary), related to an unrelated mail theft incident that took place in Los Angeles, CA, while the Officers were present.

15.   On or about January 31, 2023, Inspector E. Williams ("Inspector Williams") canvassed the public Instagram account "5tonio0" ("Subject Account 1") believed to be controlled by HERNANDEZ because the account features photos that depict a person who appears to be HERNANDEZ (see Figure 1 and Figure 2).[1]



Figure 1



Figure 2



Figure 3

16.   Inspector Williams compared the photos on that account to HERNANDEZ's California driver's license photo (see Figure 3).

_____

[1] The Instagram account is also similar in name to "Antonio" and follows other identified accounts connected to suspects in this investigation.  The person controlling this account has also posted stories and photos appearing to be HERNANDEZ on the account.

17.  Subject Account 1 also posted images of checks belonging to three addresses in Studio City, California.

18.  Postal inspectors interviewed the three check owners, who each stated they did not authorize anyone but the intended payee to possess the check.

19.  Based my involvement in the investigation, review of all the surveillance footage from the back dock theft incidents, review of the suspects driver's license photos, social media photos, and booking photos, I believe that HERNANDEZ is one of the suspects (depicted wearing the white T-shirt, black pants, and black and white Vans) who participated in the Studio City Post Office back dock theft.

**C.    January 2023**

20.  On or about January 10, 2023, a back dock theft occurred at the Azusa Post Office, which is located at 110 West 6th Street, Azusa, California 91702.  A postal employee reported one of the suspects was "cross-eyed" (e.g., exhibited strabismus).

21.  HERNANDEZ can be described as approximately 5'9" to 5'10" and 150-170 pounds (i.e., of slight build), exhibiting strabismus (crossed eyes) with black hair and black eyes.[2]

_____

[2] Although this affidavit does not rely on the precise height and weight of HERNANDEZ for probable cause, please note that previous search warrant affidavits listed HERNANDEZ' height and weight as approximately 5'4" and 117 pounds.  However, further review of law enforcement and other database records indicates that HERNANDEZ height and weight are listed as ranging between approximately 5'9" to 5'10" and approximately 150 to 200 pounds.

22.  On or about January 11, 2023, the Officers detained HERNANDEZ when responding to a possible man with a gun call and as a suspect in an armed robbery.[3]

    a.   The Officers attempted to locate HERNANDEZ near his address of record with Los Angeles School Police Department ("LASPD"), ███████████████ , Apartment ██ , Los Angeles California (i.e., the SUBJECT PREMISES).

    b.   Near ████████████████ , Los Angeles, California, which is approximately 66 feet from the SUBJECT PREMISES, the Officers saw HERNANDEZ run from them and detained him.

23.  Later, the robbery victim identified HERNANDEZ as among a group of suspects that robbed her of her cell phone at gunpoint.

24.  The victim provided an Instagram name of "5hozers0" ("Subject Account 2") as being owned/operated by either HERNANDEZ or J.H.  During a review of Subject Account 2, LAPD officers located a video involving a traffic stop of the SILVER COROLLA.

25.  On or about January 19, 2023, J.C., the property manager of an East Los Angeles apartment building provided the Officers with surveillance video depicting a mail theft which occurred in the building around 1:30 a.m. the morning of December 17, 2022.  According to the Officers, upon review of the surveillance video, it appeared to show two Hispanic male

---

[3] At least one suspect used a firearm.

suspects stealing mail from mailboxes after being opened with a USPS Arrow Key.[4]

      a.   One suspect appeared to be wearing a distinctive gray sweatshirt with a "GAP" logo on the chest area and black Vans sneakers with a white logo.

      b.   The other suspect was wearing a tan sweater with a black beanie.

26.  Both of the Officers independently identified the suspect in the gray GAP sweatshirt as HERNANDEZ.  As explained below, the Officers arrested HERNANDEZ approximately two weeks later on or about February 1, 2023, wearing the same "GAP" sweatshirt.

27.  Two days later, on or about January 21, 2023, the Officers again arrested HERNANDEZ.[5]  The Officers stated that during that arrest, HERNANDEZ gave the Officers the SUBJECT PREMISES as his address.

**D.   February 2023**

28.  On or about February 1, 2023, the Officers were on patrol as part of the Northeast Gang Enforcement Detail.  At approximately 8:10 p.m., they saw a person who appeared to be HERNANDEZ exit the Food 4 Less grocery store at 5100 North Figueroa Street, Los Angeles, California, wearing what appeared to be the same gray GAP sweatshirt and black Vans sneakers one

---

[4] A USPS Arrow Key is a unique master serialized key used by the postal service to access mail receptacles and facilities to deliver mail.

[5] According to the Officers, HERNANDEZ threw a dumbbell at officers when they found him, and they arrested him for assault with a deadly weapon on a peace officer.

of the suspects was wearing in the surveillance video of the December 2022 mail theft incident.  The Officers arrested HERNANDEZ and located two checks made out to other people in his pants pockets.  The Officers stated that during that arrest, HERNANDEZ gave the Officers the SUBJECT PREMISES as his address.

29.  On or about February 8, 2023, both owners of the checks told me that they did not know HERNANDEZ or authorize him to possess their checks.

**E.   March 2, 2023**

30.  On or about March 2, 2023, suspects attempted a back dock theft at the La Mirada Post Office, located at 14901 Adelfa Drive, La Mirada, California 90638.

31.  The suspects used a red Jeep with a partially-taped-over license plate in an attempt to steal.  Although partially concealed, witnesses saw a license plate bearing "█████."

32.  USPIS inquiries into law enforcement databases helped determine that the plate number for this vehicle as California license plate ████████ (the "RED JEEP").

33.  Through my review of reports and surveillance video from other attempted mail theft incidents, I learned that a group of four suspects in a similar red Jeep with a partially concealed license plate attempted to steal mail from the Fullerton and Anaheim Hills Post Offices earlier that same day.

34.  According to reports, at the La Mirada Post Office incident, witnesses spotted multiple suspects in the RED JEEP, which was in the parking lot.  A USPS employee confronted the

occupants as they approached the back dock.  The RED JEEP and its occupants fled before they could steal any mail.

35.  Witnesses described the suspects as young Hispanic males (approximately 19-24 years of age) wearing masks. Furthermore, the driver was described as having a distinct "curly Edgar-style"[6] haircut.

    a.  Some law enforcement database images of HERNANDEZ depict HERNANDEZ with a haircut that appears to be "Edgar-style."  I therefore believe that one of the suspects appeared to be HERNANDEZ.

**F.   March 23, 2023**

36.  On or about March 23, 2023, the RED JEEP, with a partially concealed California license plate, committed some of the Subject Offenses at the Corona Post Office, located at 1941 California Avenue, Corona, California 92877.

37.  Surveillance video shows that approximately four suspects entered the workroom floor, stole mail, were confronted by a USPS employee, and fled.  While fleeing, one suspect[7] fell out of the RED JEEP.  The USPS employee reported that a second suspect, described as slimmer than average, punched that employee in the face.

    i.  From my review of reports, I am aware that HERNANDEZ is of slight build.  After comparing the images of the person on the surveillance video of this incident with his

---

[6] An Edgar-style haircut is characterized by a straight cut across the forehead (i.e., a bowl cut) with tapered sides, usually combed forward towards the forehead.

[7] Described as a heavier-set male.

California driver's license images, booking photographs, and other verified images, I believe that the slimmer suspect who punched the USPS employee in the face was HERNANDEZ.

38.  On or about the same day, suspects used the same RED JEEP in an attempt to steal mail from the Walnut Post Office, which is located at 280 South Lemon Avenue, Walnut, California 91788.  A USPS employee took an image of the RED JEEP's partially covered license plate.

    i.  In a report, USPS employee M.L. indicated that when approximately five Hispanic male suspects entered the workroom floor, M.L. told them, "You can't be here."

    ii.  According to M.L., one of the suspects, later described as "tall and skinny" said, "Stand back, there is nothing you can do."  While fleeing, USPS employee A.A. grabbed a suspect, whom A.A. described as heavier-set and less agile than the other suspects, but the suspect forcibly pushed A.A. away and continued to flee.

39.  Approximately one hour after the reported mail theft attempt, an Instagram account associated with user 292030681001 ("Subject Account 3"),[8] posted images of checks.

    a.  I am aware that, using the personal identifying information ("PII") visible on the images, investigators later traced some of the owners of depicted checking accounts.

---

[8] I believe this account is also controlled by HERNANDEZ because the account profile photo has a screenshot of a text message chain that includes messages between "andez," a possible abbreviation for "Hernandez," and "hozers," a moniker for J.H.

     b.   I contacted and interviewed some of those victims on March 24, 2023.  The victims interviewed stated that they mailed the check(s) from the Walnut Post Office, and they did not authorize anyone but the intended recipient to possess the check.

**G.  April 4, 2023**

40.  Based on conversations with other Postal Inspectors and review of reports and surveillance video, I know the following:

     a.   On or about April 4, 2023, at approximately 11:45 a.m., USPIS was notified about another attempted back dock theft at the La Canada Post Office, which is located at 607 Foothill Boulevard, La Canada Flintridge, California 91011.  USPS employees reported the suspects arrived in a silver Toyota Camry with tinted windows.  Four Hispanic males attempted open the door to the back workroom, but because the door was locked, the suspects did not steal mail.

     b.   About 15-30 minutes later, Global Positioning System ("GPS") history from a tracking device, obtained pursuant to a federal warrant,[9] corroborated that the silver Toyota Camry bearing California license plate 8WMH914 (the "SILVER CAMRY") was near the La Canada Flintridge Post Office around 11:41 a.m.

---

[9] On March 15, 2023, the Honorable Alicia G. Rosenberg, United States Magistrate Judge, signed a GPS tracker warrant for the SILVER CAMRY, as possible co-conspirators appeared to have used it in back dock theft incidents on February 21, 2023.  See 23-MJ-1238.

c.    After this above reported incident, the USPIS began to track the SILVER CAMRY in real time as it drove toward the Inland Empire.

41.   On or about the same day, around 12:25 p.m., USPS employees from the Upland Post Office, located at 333 East Arrow Highway, Upland, California 91785, reported that group of male suspects from a silver Toyota Camry entered the workroom and stole mail.

a.    As the suspects fled the scene, one suspect tripped and fell.  USPS employees said that they attempted to protect the stolen mail, but another suspect in the Camry, later identified as HERNANDEZ, went back, and punched one of the USPS employees in the face.

b.    Based on Postal Inspectors' review of surveillance video and a video recorded by one of the USPS employees present during the incident, the footage showed that the person, believed to be HERNANDEZ, was wearing a black hoodie, ripped denim pants, and black Vans shoes.

c.    Inspectors compared the location of the car described by witnesses with the GPS location tracking for the SILVER CAMRY and concluded that the SILVER CAMRY was at this facility during the reported robbery.

42.   On the same day at approximately 2:19 p.m., Inspectors learned the SILVER CAMRY and suspects stole mail from the back dock of the Anaheim Post Office, which is located at 2320 East Lincoln Avenue, Anaheim, California.

a.   A USPS employee reported that one of the male suspects, later identified as Ivan Murillo-Hernandez ("MURILLO-HERNANDEZ") was wearing a beige hoodie, while another suspect was wearing a black hat.  The employee stated the SILVER CAMRY's license plate was partially covered with black tape.

b.   Inspectors reviewed the GPS tracking data for the SILVER CAMRY and concluded that it was at this facility during the reported theft.

43.  On the same day, at approximately 2:48 p.m., Inspector G. Ramirez and I located the SILVER CAMRY parked behind Toyo Sushi restaurant, which is located at 676 South State College Boulevard, Anaheim, California.  The SILVER CAMRY was beside a trash dumpster.

44.  Inspector G. Ramirez stated that he saw people taking turns carrying mail from the SILVER CAMRY to the dumpster while a young Hispanic male, appearing to be tall and thin, sat in the driver's seat with the door open.[10]

45.  Inspector Ramirez further stated that one of the other occupants was a Hispanic male in his late teens to early twenties with a large build wearing a beanie on his head, who appeared to be J.H.

46.  As the SILVER CAMRY drove away, with other Inspectors pursuing it, Inspectors G. Ramirez and S. Robbins recovered discarded mail from ground and the dumpster, which also

_____

[10] Inspector Ramirez also videorecorded the occupants throwing what appeared to be mail out of the SILVER CAMRY onto the ground.

contained a separate bag of loose mail.[11]   The recovered stolen mail listed Anaheim addresses.

47.   Inspectors followed the SILVER CAMRY to a nearby Mobil gas station (the "Mobil"), which is located at 1200 North State College Boulevard, Anaheim, California.   At approximately 2:56 p.m., I requested assistance from the Anaheim Police Department ("APD") to conduct a traffic stop of the SILVER CAMRY.   By that time, APD had also received a 911 call from the Anaheim Post Office employees.

a.   Inspector L. Watanabe was parked at the Starbucks parking lot at 1134 North State College Boulevard, Anaheim, California 92806 (across the street from the Mobil) and could see two suspects exit the SILVER CAMRY and enter the Mobil, while one suspects remained near the SILVER CAMRY. Inspector Watanabe took photos of the SILVER CAMRY (see, e.g., Figure 4).



*Figure 4*

48.   As a marked APD unit approached the SILVER CAMRY, it fled from law enforcement at a high speed, turning left out of the parking lot onto North Placentia Avenue.

49.   Inspector Watanabe saw the APD marked unit activate its emergency lights and pursue the SILVER CAMRY, followed by

---

[11] The recovered mail was booked in as evidence.

additional marked APD units, which turned right onto Orangethorpe Avenue.  I received notification that the SILVER CAMRY had taken the onramp from Orangethorpe Avenue onto California State Route 57 North (the "57 North").

      a.   Inspectors Robbins and I tried to follow, as well, but were unable to do so.  Due to unsafe speeds of the SILVER CAMRY, the APD aborted their attempt to conduct a traffic stop.

50.  I learned from the California Highway Patrol ("CHP") dispatch that APD had requested CHP assistance, and Inspectors witnessed CHP and APD dispatched their helicopters to the 57 North.

51.  GPS data showed that the SILVER CAMRY continued on the 57 North until it transferred to the 60 West freeway.

52.  According to CHP Officer Esparza, who pursued the SILVER CAMRY on the 60 West, the occupants tossed mail out the window, as corroborated by his patrol vehicle's dashboard video of the chase.

      a.   Later, Inspectors reviewed Instagram account "chubbsdarula"[12] ("Subject Account 4"), which posted a video from inside the SILVER CAMRY during the chase, as well as a photograph of an envelope[13] full of various checks, with the caption, "moments before disaster."

---

[12] Later in a Mirandized post-arrest interview, MURILLO-HERNANDEZ, who was an occupant of the SILVER CAMRY, told Officer Esparza that Subject Account 4 belonged to F.M.V.

[13] That envelope was not recovered.

53.   Shortly after, the SILVER CAMRY exited the 60 West freeway at Nogales Street.  According to CHP dispatch, CHP officers found a silver Toyota Camry abandoned on Grassmere Street, and, with the Los Angeles Sheriff's Department, pursued the suspects on foot.  GPS tracking data indicated that CHP had found the SILVER CAMRY.  CHP conducted an inventory search of and impounded the SILVER CAMRY.  Inspectors recovered the GPS tracker.

54.   On the same day at approximately 4:00 p.m., I learned that CHP caught three of the five suspects.  The driver was identified as D.M.R., a minor.  Two of the passengers were identified as MURILLO-HERNANDEZ, and F.M.V., another minor.  The other two passengers evaded capture.  Additional investigation described below leads me to believe that the two passengers who escaped were HERNANDEZ and J.H.

55.   I reviewed CHP's helicopter surveillance video (see Figure 5), which captured most of the chase and the moment when the suspects abandoned the SILVER CAMRY and fled on foot.  Based on seeing three of the five suspects in person, I recognized D.M.R. exit from the driver's seat, and F.M.V. exit the passenger seat.  In the back driver side appeared to be J.H.  The person who fled from the back middle seat appeared to be

HERNANDEZ while MURILLO-HERNANDEZ had been seated in the back passenger-side seat.



*Figure 5*

### H. MURILLO-HERNANDEZ Admits to Stealing Mail

56.    Later on the same day, according to CHP Officer Esparza, he Mirandized MURILLO-HERNANDEZ at their Baldwin Park station, and MURILLO-HERNANDEZ stated he understood his rights and waived them.   During the recorded interview, MURILLO-HERNANDEZ stated the following, in summary:

        a.    MURILLO-HERNANDEZ knows D.M.R. from school, and D.M.R. knows the skinny suspect in the black hoodie and jeans.

b.    There are two separate crews (him and D.M.R.), and the other three passengers, whom he described as "Buff Boy," "Skinny," and "Big Boy."[14]

c.    MURILLO-HERNANDEZ admitted they were stealing mail throughout the day.  They would search for nearby post offices on Google and steal the mail left outside.  MURILLO-HERNANDEZ claimed this was his first time stealing mail.

d.    MURILLO-HERNANDEZ stated that they looked for checks to sell on Instagram to "random people," and sometimes split the profit.  Other times, he only made $100.00.

e.    MURILLO-HERNANDEZ's Instagram account username is "ivann_1973" ("Subject Account 5") and F.M.V.'s is Subject Account 4.

**I.    GPS Tracker Data Appears to Show the Silver Camry Stopping at Each Suspect's Residence, Including the SUBJECT PREMISES**

57.    On or about April 5, 2023, the day after the vehicle pursuit, I reviewed the GPS tracker history of the SILVER CAMRY and discovered, in summary, that on or about April 4, 2023:

a.    Between approximately 10:00 a.m. and 10:45 a.m., the SILVER CAMRY drove from Lynwood, California to the SUBJECT PREMISES, then to the address of record for D.M.R., and then to the address of record for F.M.V. before driving to the La Canada Post Office.

---

[14] Based on my familiarity with the appearances of the suspects depicted in the surveillance videos from April 4, 2023, I believe that MURILLO-HERNANDEZ referred to J.H., HERNANDEZ, and F.M.V., respectively.

b.   At approximately 12:28 p.m., the SILVER CAMRY stopped at the Upland Post Office.

c.   At approximately 12:45 p.m., the SILVER CAMRY stopped at the intersection of Grove Ave. and 4th Street in Ontario, California, later identified as an Arco Gas Station.

i.   On or about April 6, 2023, I retrieved surveillance video from businesses near the intersection of Grove Avenue and 4th Street in Ontario, California, including the Arco Gas Station located at 1245 East 4th Street, Ontario, California.

ii.   I reviewed the video, which depicted the SILVER CAMRY, stopped for gas (see Figure 6).  Given my review of reports, my real time surveillance, and my knowledge of the five suspects' appearances, the footage also appears to depict F.M.V. and HERNANDEZ outside of the SILVER CAMRY.



*Figure 6*

d.    Between approximately 1:20 p.m. and 2:45 p.m., the SILVER CAMRY stopped at the Riverside Arlington, Corona Citrus, and Anaheim Post Offices.

e.    At approximately 2:45 p.m., the SILVER CAMRY stopped at a parking lot behind Toyo Sushi.

f.    At approximately 3:00 p.m., the SILVER CAMRY stopped at the Mobil gas station.

g.    At approximately 3:37 p.m., the SILVER CAMRY stopped on a residential street in West Covina and did not travel further.[15]

**J.    June 2023**

58.    On or about June 8, 2023, USPS Supervisor B.P. reported to the USPIS that three suspects, described as young Hispanic males, thin and wearing hoodies, entered the workroom floor of the West Hills Post Office, which is located at 23055 Sherman Way, West Hills, California 91307.  The suspects entered through the back dock and stole mail before fleeing in a black Mercedes Benz sedan.

59.    That same day, a USPS employee from the El Segundo Post Office, located at 2130 East Mariposa Avenue, El Segundo, California 90245, reported to the USPIS that two Hispanic males, approximately 18-25 years old with a thin or normal build stole mail from the back dock of the post office and fled in a black BMW sedan.

---

[15] This is where law enforcement found the vehicle at the conclusion of the pursuit.

60.   Later the same day, at approximately 8:10 p.m., Subject Account 1 posted a video that appears to show the user sorting through dozens of different checks, including a light pink check for $555,099.25 from an account at JP Morgan Chase, N.A. (see Figure 7).



*Figure 7*

61.   On or about June 9, 2023, at approximately 2:00 a.m., an Instagram user account "jesse_arias57" posted a story depicting an image of three checks that appeared to resemble the checks in the June 8, 2023 Subject Account 1 video and tagged the story with Subject Account 1.

62.   On June 9, 2023, at approximately 2:00 a.m., an Instagram account "100k_hozers" ("Subject Account 6") believed to be controlled by J.H., posted a story depicting an image of eight checks that resemble the appearance and color of the checks depicted in Subject Account 1's June 8, 2023, Instagram video.   One of these checks bears an account holder's address in El Segundo, California.

63.   Based on the text on the post, "LMK ON BANKS / get
paid / got slips ready", and my training and experience, I
understood this to mean "Let me know on banks," and that the
individual controlling Subject Account 6 was asking followers
for bank accounts to use to deposit these checks in exchange for
money.

64.   Also on June 9, 2023, Subject Account 1 posted another
story that appears to show the
user behind the wheel of a
black Mercedes Benz vehicle.[16]

65.   On or about June 12,
2023, USPS Supervisor R.S. at
the Sunkist Post Office, which
is located at 2320 E. Lincoln
Ave., Anaheim, CA 92816, saw
three young Hispanic males in
a black Mercedes Benz steal
mail from the workroom floor
of the Sunkist Post Office.



Figure 8

---

[16] Based on the steering wheel bearing the brand logo for
Mercedes Benz.

66.   That same day, Subject Account 1 posted a video story of a person that appears to be HERNANDEZ sitting in the driver's seat of a black Mercedes Bens sedan holding a large amount of cash (see Figure 9). This appears to be HERNANDEZ based on skin tone, size, and weight, as well as hair color and haircut style. Furthermore, in this image, the male subject is wearing white Jordan shoes



*Figure 9*

with a light blue strip in the laces area.   Subject Account 1 has posted a photo of HERNANDEZ wearing the same shoes (see Figures 2 (above) and Figure 10).

67.   A second post appears to depict the user driving the Mercedes while listening to music, and a third video depicts several checks in various amounts with the caption "BANKS!! BOA CHASE NAVY FEDERAL WELLS FARGO!"

**K.   Subject Account 1 Showed the User Possessed Several Stolen Checks**

68.   Based on my review of investigative reports, surveillance images, public Instagram records, and other evidence, I know the following:

a.   On or about December 27, 2022, victim M.D. reported that a check she mailed from the La Canada-Flintridge Post Office; however, it never arrived at its

*Figure 10*

intended destination, an apartment on South Avenue 55, Los Angeles, California, a few streets from the SUBJECT PREMISES. Instead, it was discovered that on or about November 27, 2022, the check was fraudulently negotiated for $1,800.

      b.   Wells Fargo Bank records showed that the above-mentioned check was deposited into an account number ending in --7626.  The account signatory is J.H., at the SUBJECT PREMISES.

      c.   Wells Fargo surveillance images from November 27, 2022, of the corresponding ATM transaction appeared to show images of J.H. and HERNANDEZ fraudulently depositing the stolen check.

69.  As previously explained, a back dock theft incident occurred at the Studio City Post Office on or about December 28, 2022.  Postal inspectors contacted some of the identifiable victims, who stated that they did not authorize anyone but the intended recipient to possess the check.

70.  As previously explained, a back dock theft incident occurred at the West Hills Post Office on or about June 8, 2023. On or about June 9, 2023, and again on or about June 12, 2023, Inspector Williams reviewed content from Subject Account 1 and saw a post from that account that displayed several checks, each dated on or about June 8, 2023.

71.  On or about June 12, 2023, Inspector Williams contacted identifiable victims, who stated that they did not authorize anyone but the intended recipient to possess the check.

**L.    The Officers Confirmed HERNANDEZ's Residence**

72.    Based on HERNANDEZ' numerous previous encounters with the Officers in the apartment building containing the SUBJECT PREMISES within the last year, some of which are described above, I believe that HERNANDEZ resides at the SUBJECT PREMISES, which is listed in law enforcement databases as his address of record.  More specifically, the Officers relayed that they regularly patrol the building containing the SUBJECT PREMISES, have seen HERNANDEZ in that building at least 20 times, and have seen him go into or out of the SUBJECT PREMISES at least three times.  The Officers have told me that the two previous times that they arrested HERNANDEZ, he told them that his address was the SUBJECT PREMISES.

73.    Most recently, on July 16, 2023 and August 5, 2023, Officers were patrolling the building containing the SUBJECT PREMISES and saw HERNANDEZ in the same apartment building as the SUBJECT PREMISES, where they have also encountered his other family members.

**V. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT AND FRAUD**

74.    Based on my training and experience, and my consultation with other United States Postal Inspectors, who have over fifty years of combined service, I am aware of organized mail theft rings that operate as follows:

a.    The members of the rings steal mail in a variety of ways, including by using stolen or counterfeit USPS arrow keys to open USPS collection or mailboxes; jamming the USPS

collection boxes with paper so envelopes placed into USPS collection boxes are accessible to someone reaching into the box; reaching into USPS collection boxes overflowing with United States Mail; by "mailboxing," a process by which individuals drive through neighborhoods and steal both outgoing and incoming United States Mail from residential mailboxes; or by "fishing," using a homemade sticky device lowered into USPS collections boxes to extract United States Mail through the deposit slot; or by filing false change of address applications with the USPS to redirect incoming United States Mail to an address controlled by the perpetrators; or by stealing mail directly from a USPS facility such as a post office off of loading docks or even from restricted areas on the workroom floors that are utilized by authorized USPS personnel only.

b.   The members of the rings typically steal United States Mail to obtain USPS customers' credit cards, credit card statements, credit card convenience checks, and correspondence, which contains other people's checks, access devices, other personal identifying information ("PII," which includes names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers), and identification documents to fraudulently obtain money or other items of value.

c.   The members of the rings use the credit card numbers obtained from the stolen United States Mail matter to fraudulently order or purchase merchandise and will utilize the

28

USPS customers' financial information to fraudulently apply for
credit cards issued in the USPS customers' names.

     d.  Members of the rings will also steal United
States Mail to obtain personal checks, money orders, and cash or
other cash equivalents, originally completed and mailed by the
true account holders as payment to the account holders'
creditors.  The checks may then be used to gain financial
information including account numbers, account holders' names
and addresses.  Often this information is used to counterfeit
additional checks, unless able to obtain blank checks, which are
then fraudulently made payable to other members of the ring.
The checks may also be chemically "washed" to remove the
handwritten information and additionally altered to be made
payable in higher amounts than originally written and
fraudulently cashed by ring members.

     e.  The proceeds generated from the mail theft and
related fraud activities are often used to buy methamphetamine
or other illegal drugs, which are then used to recruit
additional individuals to facilitate the scheme.  Recruitment is
frequently accomplished through social media such as Instagram,
Telegram, and other services.

    75.  Based upon my training, experience, and information
related to me by other law enforcement personnel who specialize
in the investigation of mail theft crimes and related financial
crimes, I have learned that it is common practice for
individuals involved in access device fraud, bank fraud, and
identity theft to use and maintain computers and mobile devices

at their residence and business.  Such computers and mobile devices are used to track their fraudulent transactions. Suspects often use computers and mobile devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ computers and mobile devices for the purposes, among others, of 1) applying on-line for fraudulent credit cards, 2) obtaining personal identification information for the purpose of establishing or modifying fraudulent credit card accounts, 3) using fraudulently obtained credit cards to make purchases, sometimes of further personal information, and 4) keeping records of their crimes or "profiles" of victims' PII. Mail and identity thieves, as well as individuals engaged in bank and access device fraud, also often use hardware (such as embossing machines, laser printers, and magnetic card readers) and software to print fake credit and identification cards, create magnetic strips for credit cards, print fake checks, and re-encode credit cards.  Software used in such fraudulent schemes can often be found on digital devices, such as computers or cellular phones.

76.  Based on my training and experience, individuals who participate in mail theft, identity theft, and access device fraud schemes often have co-schemers and often keep on their digital devices their co-schemers' telephone numbers, email addresses, and other contact information.  Such individuals often use their digital devices to communicate with co-schemers by phone, text or photographic messages, email, and social

media, and often store those communications on their digital devices.

77.  Based on my training and experience, I also know that individuals who participate in mail theft, identity theft, and access devices fraud may have multiple digital devices with different IP addresses to further anonymize their online transactions and evade detection by law enforcement.

78.  Based on my training and conversations with other law enforcement agents who have investigated fraud schemes, I know that individuals who engage in such schemes often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, or other digital devices for years after the fraudulent scheme has been completed.

79.  Based on my training, experience, and conversations with other law enforcement agents who have investigated fraudulent schemes, I know that digital devices, documents, and clothing used for disguises are commonly used in fraudulent schemes and kept at suspects' residences.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

80.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.  Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

81.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

      a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

      b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

82.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

     a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

     b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

     c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERNANDEZ's thumb and/or fingers on the

device(s); and (2) hold the device(s) in front of HERNANDEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

83.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

22.    For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT PREMISES, as more fully described in Attachment A-1, and on the person of HERNANDEZ, as more fully described in Attachment A-2.

_____

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 15th day of August, 2023.

_____
HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE